**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HENRY W. MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-2509 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| UNION PACIFIC RAILROAD CO., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Henry Martin suffered two injuries while working as a conductor on a passenger train for Union Pacific Railroad. The first incident involved a falling Thermos. The container belonged to a passenger on the second level of the commuter train, and it fell and hit Martin while he was punching tickets. The tumbling tumbler, he claims, caused a shoulder injury.

The second incident involved more people and a more serious situation. A few months after the Thermos incident, Martin escorted a drunken, unruly passenger off the train. The exit was less than graceful. When the passenger got off the train, he got in a physical altercation with one of Martin's co-workers. Martin jumped into the fray, and he punched the passenger multiple times in the head. And in the process, Martin hurt his hand.

The situation went from bad to worse. A few days later, Union Pacific terminated Martin. According to the company, Martin violated a number of rules when he got into a fight with a passenger.

Martin responded by filing suit against the company. He brings two negligence-based claims under the Federal Employers' Liability Act for the injuries to his shoulder and his hand.

He also brings a retaliation claim under the Federal Railroad Safety Act, alleging that the company fired him for reporting his hand injury.

After discovery, Union Pacific moved for summary judgment. For the reasons that follow, the motion for summary judgment is granted in part and denied in part.

## Background

Plaintiff Henry Martin works as a train conductor for Defendant Union Pacific Railroad. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 2 (Dckt. No. 82). He helps Union Pacific operate the Metra commuter trains that run between Waukegan and Chicago. *Id.* Martin started working as a conductor at Union Pacific in 2004. *See* Martin Dep., at 25:23 – 26:3 (Dckt. No. 86-2, at 8 of 28); Injury Report (Dckt. No. 78-2). He helps people get from here to there, all day long.

The case involves two physical injuries that Martin suffered in 2017. The first injury happened when an object fell from an overhead storage rack. The second injury took place a few months later, when an unruly passenger started swinging.

On July 5, 2017, Martin was working as a conductor on a northbound train. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 5 (Dckt. No. 82). The train had two levels of seating, with storage racks for passengers above the main aisle of each train car. *Id.* at ¶¶ 8–9.

Anyone who has ever ridden on a Metra train knows what the storage racks look like. They're right above the aisle, and they run the length of the train car. They're not very high, because riders on the first level sometimes put their belongings on them. The racks aren't fancy – they look like a ladder that is laying flat, except the rungs are much closer together.[1]

---

[1] This level of detail about the storage racks isn't in the record. In fact, the parties barely provided any information about the appearance, structure, or placement of the storage racks. The record is barren about the actual look and design of the racks, which poses a problem for any theory of liability about their

The racks are minimalist.  The bottom is open (again, like rungs on a ladder), and they do not have protective sides.  They're basically a grate where you can stick your bag.  Things could fall off, or fall through.

People above can drop things on people below, and that's basically what happened on the day in question.  While Martin was punching tickets for passengers on the lower level, a Thermos fell from above and hit Martin's left shoulder.  *Id.* at ¶ 6.  The record does reveal whether anything was in the Thermos, or how heavy it was.  But it landed on Martin, and it hurt.

Martin couldn't tell where the Thermos fell from.  The passenger who owned the Thermos was sitting on the second level, and he apologized to Martin.  *Id.* at ¶¶ 7–8.  The passenger told Martin that the Thermos must have fallen out of his bag, which was left open.  *Id.* at ¶ 8.

The placement of the bag is a mystery, leaving a gaping hole in the evidentiary record. Martin doesn't know if the passenger's bag was placed on the second-level storage rack, or somewhere else.  *Id.*  The Thermos fell from a bag that was who-knows-where.

A few days later, Martin submitted an injury report to Union Pacific.  *See* Injury Report (Dckt. No. 78-2).  He also gave a statement about his injuries.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 11 (Dckt. No. 82).  Martin reported that he was experiencing pain in his shoulder that radiated down his arm and into his left hand.  *See* Injury Report (Dckt. No. 78-2).

In Martin's experience, things didn't fall from the second level of the train very often. He recalled it happening only one other time during his employment as a conductor.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 9 (Dckt. No. 82).  He did not report that earlier incident to Union Pacific.  *Id.*

---

design.  Even so, anyone who has taken a train to, say, Ravinia knows what the racks look like.  The Court gives a description simply to help the reader visualize the inside of the train car.

A few months later, on October 27, 2017, Martin got embroiled in a second incident. Martin was working as a conductor on a train bound for Chicago. *Id.* at ¶ 19. He was working with fellow crew members Michael Gilbert and Joseph Wright. *Id.* at ¶¶ 19, 22.

After the train departed the Lake Forest stop, Gilbert contacted Martin with a problem. *Id.* at ¶ 19. A passenger in Gilbert's train car, Mario Watson, was being disruptive. *Id.* at ¶ 20. Gilbert explained that Watson was swearing, threatening to shoot people, and calling passengers "all kind of names." *See* Martin Dep., at 158:10-20 (Dckt. No. 86-3, at 13 of 29). The two agreed that Martin would try talking to Watson. *Id.* at 160:5-7.

When Martin approached, he "smelled alcohol really[,] really strong" on Watson. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 19 (Dckt. No. 92). After the two spoke, Watson agreed to calm down. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 21 (Dckt. No. 82). At that point, Martin didn't think that Watson was a threat. *Id.*

Things soon deteriorated. Watson resumed his loud and unruly behavior. *Id.* at ¶ 22. So, Martin told his fellow crew members that they would ask Watson to leave the train at the next stop. *Id.*

The exit from the train did not go smoothly. When the train came to the station, Martin told Watson that he had to leave the train. *Id.* at ¶ 23. Wright opened the train doors, and Gilbert got off the train and went onto the platform, positioning himself so that no passengers could enter the train while Watson exited. *See* Martin Dep., at 166:20 – 168:5 (Dckt. No. 86-3, at 15 of 29).

Watson didn't leave the train quietly. He shouted obscenities at Martin after he was told to leave the train. *Id.* at 181:16 – 183:12. As Watson exited, he approached Gilbert (who was

standing on the platform), shouting. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 24 (Dckt. No. 82).

Watson pointed one hand at Gilbert as he approached, with his other hand balled into a fist. *See* Martin Dep., at 183:14-24 (Dckt. No. 86-3, at 19 of 29). Gilbert started moving backwards. *Id.* at 184:14-17. He told Watson to get out of his face. *Id.* at 185:16-23.

Watson didn't comply. Instead, he chest-bumped Gilbert and put his finger into Gilbert's face. *Id.* at 185:23 – 186:6. That's when Gilbert threw a punch. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 25 (Dckt. No. 82).

A melee ensued. Watson and Gilbert started fighting, and Gilbert ended up on the ground, hitting his head on the concrete. *Id.* at ¶ 27; Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 24 (Dckt. No. 92); Martin Dep., at 187:3-14 (Dckt. No. 86-3, at 20 of 29). Watson then punched Gilbert in the back of the head, and Gilbert briefly lost consciousness. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 24 (Dckt. No. 92).

Martin sprang into action and intervened. He tried to pull Watson off Gilbert, but he couldn't get a good grip. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 27 (Dckt. No. 82). Martin couldn't pull Watson off Gilbert. So Martin started throwing punches. He hit Watson at least six times in the face and head. *Id.* at ¶¶ 27–28.

Wright, meanwhile, contacted the train engineer, who called the police. *Id.* at ¶ 26. When the officers arrived, they noticed that Watson "was acting aggressively, shouting, cursing, pacing, flailing his hand, and exhibiting a heavy odor of alcohol." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 12 (Dckt. No. 92). One officer "felt that Watson was potentially a threat to her and the other responding Highland Park Police officers." *Id.*

After the police arrived, Martin called Union Pacific's commuter control and informed them of the altercation. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 30 (Dckt. No. 82). Martin testified that he also informed commuter control that he was injured, but Union Pacific's transcript of the call doesn't show that he mentioned his injury. *Id.*

With the melee over, Martin reboarded the train and finished the scheduled route to Chicago. *Id.* at ¶ 31. Fortunately, the rest of the trip was uneventful.

At the Chicago train station, Martin ran into Jason Reed, Union Pacific's Superintendent of Commuter Operations. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 26 (Dckt. No. 92). According to Martin, Reed already knew about the altercation and was aware that he had been injured during the fight. *Id.*

Reed seemed to offer conflicting testimony about this issue at deposition. At one point, Reed testified that he didn't know that Martin was injured. *Id.*; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 48 (Dckt. No. 82). But elsewhere, Reed testified that Martin "informed [him] that his hand was swollen" because of the altercation with Watson. *See* Reed Dep., at 39:22 – 40:11 (Dckt. No. 86-6, at 10 of 31). Reed also explained that he "made sure that there was a manager there that was taking Mr. Martin to urgent care to get his hand checked out." *Id.* at 40:9-11.

Two Union Pacific managers – Craig Lockhart and Catherine Gibson – ultimately took Martin to an immediate care center, where he received treatment. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 31 (Dckt. No. 82). After seeing a doctor, Martin told Union Pacific that he could not write because of the condition of his hand. *Id.* at ¶ 37. So, instead of completing a written statement about the incident, everyone agreed that Martin would give his statement on

Monday, October 30. *Id.* That was the next business day, because the incident took place on Friday, October 27.

Martin didn't end up giving this statement. In fact, he never completed any statement summarizing the incident or reporting his hand injury. *Id.* at ¶ 49. Instead, Union Pacific called him on Sunday, October 29 to tell him that he was being pulled from service. *Id.* at ¶ 53.

Martin later received a "Notice of Investigation," which informed him that he was charged with violating three Union Pacific rules: Rule 1.6 ("Conduct-Quarrelsome"), Rule 1.7 ("Altercations"), and Rule 1.13 ("Reporting and Complying with Instructions"). *Id.* at ¶ 54.

The notice said that violating those rules could lead to dismissal. *Id.* That is, Union Pacific viewed Martin's decision to punch Watson as a fireable offense. Both Reed and Sean McGovern, Union Pacific's Director of Road Operations, testified that Union Pacific has a zero-tolerance policy for violence in the workplace and altercations with passengers. *Id.* at ¶ 18.

In early December 2017, Union Pacific held an investigative hearing into Martin's conduct on October 27. *Id.* at ¶ 55. Based on the hearing, Union Pacific fired Martin on December 15. *Id.* Reed – who spoke with Martin at the Chicago train station after the incident – signed the termination letter. *Id.*

For his part, Martin didn't think that he had violated Union Pacific's rules when fighting with Watson. He challenged his termination before the National Mediation Board.

In that proceeding, Union Pacific took the position that Martin had violated Rule 1.6, Rule 1.7, or Rule 1.13. Union Pacific also pointed to its "Ejection of Passengers" policy as a reason for firing Martin. The policy basically requires employees to place unruly passengers into police custody:

Ejection of our customers is a last resort. Every attempt must be made to utilize calm and reason when handling these Situations. The following guidelines must be used when it becomes necessary to eject a passenger:

If practicable you must enlist the assistance of a fellow train crew member.

*Passengers may only be removed from the train when they are placed in the custody of the police or another responsible authority.*

Crew members will not warn a passenger that they have the option to leave the train or be arrested.

Make every attempt to defuse the situation. Reason with the customer when possible.

Unless an emergency situation exists, do not inform the engineer or commuter control with the customer present. This often increases the hostility and tension of the situation.

"Ejection/Confiscated Ticket Report" must be filled out and submitted to Commuter Control for anyone ejected or refused boarding.

*See* Passenger Ejection Policy (Dckt. No. 78-3) (emphasis added). Union Pacific claimed that Martin had failed to follow this policy by not calling the police *before* ejecting Watson. *See* Nat'l Mediation Bd. Decision, at 3 (Dckt. No. 87-1).

While awaiting the Board's decision, Martin filed suit against Union Pacific in federal court in April 2019. *See* Cplt. (Dckt. No. 1). The complaint has three counts. The first claim is about the Thermos, and the other two claims are about the incident with Watson.

Count I alleges that Union Pacific is liable under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, for the injuries that he suffered when the Thermos fell on his shoulder in July 2017. *See* Cplt., at ¶¶ 9–18 (Dckt. No. 1). Count II alleges that Union Pacific is liable under the FELA for the hand injury that he suffered during the altercation with Watson. *See id.* at ¶¶ 19–32. Count III alleges that Union Pacific violated the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109 *et seq.*, by firing him for reporting his hand injury from his

8

altercation with Watson. *See* Cplt., at ¶¶ 33–54 (Dckt. No. 1). Martin's FRSA claim does not allege that he was fired for reporting his *shoulder* injury (from the Thermos). *Id.*

In July 2019, the Board found that the evidence did not support Union Pacific's conclusion that Martin had violated company rules or policies. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 35 (Dckt. No. 92). Martin was reinstated with back pay and benefits. *See* Nat'l Mediation Bd. Decision, at 4 (Dckt. No. 87-1).

In the months that followed, the parties embarked on discovery in this federal lawsuit. When it was all said and done, Union Pacific moved for summary judgment on all three counts. *See* Def.'s Mtn. for Summ. J. (Dckt. No. 77). That motion is now before the Court.

Before diving into the merits of Union Pacific's summary judgment motion, the Court notes that this case isn't the first lawsuit in this District to come out of the October 27th brawl. Gilbert also sued Union Pacific under the FELA and the FRSA after he, too, was injured and then fired after reporting his injuries. *See Gilbert v. Union Pac. R.R. Co.*, 2022 WL 1556101, at *1 (N.D. Ill. 2022) (Feinerman, J.). Union Pacific also moved for summary judgment, and Judge Feinerman denied its motion in full. *Id.*

That said, this case is similar, but not identical, to *Gilbert*. That case, for example, didn't involve a collision with a Thermos. At the end of the day, what matters are the facts specific to Martin's claims. So, the Court will rely on *Gilbert* to the extent that it is helpful and on point. But this Court must independently assess the facts and law in the case at hand.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

The Court begins with Martin's claims under the Federal Employers' Liability Act (again, "FELA"), based on his injuries from the falling Thermos (Count I) and the fight with Watson (Count II). Then, the Court will address Martin's claim of retaliation under the Federal Railroad Safety Act (again, "FRSA") for reporting his injured hand (Count III).

## I.    FELA Claims (Counts I and II)

Martin seeks compensation for the injuries to his shoulder and his hand, and he invokes a statute that protects railroad workers. The Court concludes that there is enough evidence to get to trial on the hand injury, but not the shoulder injury.

10

"The FELA provides a federal remedy for railroad employees who are injured on the job." *Abernathy v. E. Illinois R.R. Co.*, 940 F.3d 982, 988 (7th Cir. 2019). Under the statute, "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." *See* 45 U.S.C. § 51. The statute "imposes on railroads a general duty to provide a safe workplace." *Holbrook v. Norfolk S. Ry. Co.*, 414 F.3d 739, 741 (7th Cir. 2005) (quotation marks omitted).

The FELA is a negligence statute. "To prove a claim under the FELA, a plaintiff must prove 'the traditional common law elements of negligence, including foreseeability, duty, breach, and causation.'" *Abernathy*, 940 F.3d at 988 (quoting *Fulk v. Illinois Cent. R.R. Co.*, 22 F.3d 120, 124 (7th Cir. 1994)). The statute also requires "a FELA claimant to prove that he was injured while in the scope of his employment." *Wilson v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 841 F.2d 1347, 1351 (7th Cir. 1988). However, FELA claims do not require a showing of proximate cause (*i.e.*, legal cause). *See CSX Transp., Inc. v. McBride*, 564 U.S. 685, 688 (2011).

Like any plaintiff bringing a negligence claim, a FELA plaintiff must show foreseeability of harm. *Id.* at 703. When a FELA claim is based on "unsafe work conditions," the plaintiff proves foreseeability by showing "circumstances which a reasonable person would foresee as creating a potential for harm." *LeDure v. Union Pac. R.R. Co.*, 962 F.3d 907, 910 (7th Cir. 2020) (quoting *Holbrook*, 414 F.3d at 742).

The Seventh Circuit "equate[s] foreseeability with notice, either actual or constructive." *Williams v. Nat'l R.R. Passenger Corp.*, 161 F.3d 1059, 1062 (7th Cir. 1998). To prove the foreseeability of an unsafe work condition, "[t]he plaintiff 'must show that the employer had

11

actual or constructive notice of [the] harmful circumstances.'" *LeDure*, 962 F.3d at 911 (quoting *Holbrook*, 414 F.3d at 742). Applying this standard, "if a person has no reasonable ground to anticipate that a particular condition . . . would or might result in a mishap and injury, then the party is not required to do anything to correct the condition." *See CSX Transp.*, 564 U.S. at 703 (cleaned up).

A plaintiff with a FELA claim has a lower burden than a plaintiff with a run-of-the-mill negligence claim. The "FELA is a remedial statute, lowering the burden of proof so that an employee might meet it if 'employer negligence played any part, even the slightest, in producing the injury.'" *Ruark v. Union Pac. R.R. Co.*, 916 F.3d 619, 625 (7th Cir. 2019) (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957)). "[A] plaintiff's burden when suing under the FELA is significantly lighter than in an ordinary negligence case." *Abernathy*, 940 F.3d at 988 (quotation marks omitted); *see also Harbin v. Burlington N. R.R. Co.*, 921 F.2d 129, 131 (7th Cir. 1990) ("It is well established that the quantum of evidence required to establish liability in an FELA case is much less than in an ordinary negligence action."). The burden is lighter, and the hurdle is lower.

Applying that standard at the summary judgment stage means that "a FELA case should go to a jury if even the slightest of facts support a finding of negligence." *Ruark*, 916 F.3d at 625; *see also Holbrook*, 414 F.3d at 742 ("With this lighter burden of proof, a [FELA] plaintiff can more easily survive a motion for summary judgment."); *Gilbert*, 2022 WL 1556101, at *6.

That said, even a light burden does not carry itself. A light burden must be carried by the person who hopes to get to trial. The lightened evidentiary load "does not mean that an employer is responsible for any injury that occurs in the course of employment." *Ruark*, 916

12

F.3d at 625. The FELA is not a strict liability statute. *See Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543–44 (1994).

"As light as this burden is, the plaintiff must still present some evidence of negligence . . . specifically, the plaintiff must offer evidence creating a genuine issue of fact on the common law elements of negligence, including duty, breach, foreseeability, and causation." *Ruark*, 916 F.3d at 625–26 (ellipsis in original) (quotation marks omitted). "A FELA plaintiff is not impervious to summary judgment. If the plaintiff presents no evidence whatsoever to support the inference of negligence, the railroad's summary judgment motion is properly granted." *Id.* at 626 (quotation marks omitted); *see also Williams*, 161 F.3d at 1061–62 ("A FELA plaintiff who fails to produce even the slightest evidence of negligence will lose at summary judgment.").

With that framework in mind, the Court turns to the evidence about the two incidents. Based on the record, the Court concludes that Martin has not mustered enough evidence to get to trial on the claim about the falling Thermos. But Martin has offered enough evidence to get to trial about the brawl with Watson.

### A.     The Injured Shoulder from the Falling Thermos (Count I)

Martin begins with the claim that Union Pacific is liable under the FELA for an injury that he suffered when a Thermos fell and hit his shoulder. On this record, there is not enough evidence to get to a jury.

According to Martin, Union Pacific was negligent because it "had no regulations in place to control what passengers store in the overhead racks; no method to secure items brought aboard the trains; and no way to keep items stored in place while the train was moving and jostling around during travel." *See* Resp. to Mtn. for Summ. J., at 36 (Dckt. No. 89).

13

The Court understands Martin to raise two theories of liability. The first theory is about the safety of the design of the storage racks. The second theory is about the absence of regulations for how passengers must store personal items. Under either theory, Union Pacific is entitled to summary judgment.

Martin's first theory is that the storage racks were unsafe because they didn't keep items adequately secure while the train was moving. Martin believes that Union Pacific "should put up nets or redesign the passenger storage system." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 9 (Dckt. No. 82).[2]

So, Martin is arguing that the storage racks posed an unreasonable danger. In other words, he argues that the storage racks had a defective design. They failed to keep him reasonably safe.

To succeed on a theory based on defective storage racks, Martin needs to show that Union Pacific "had actual or constructive notice of [the] harmful circumstances." *LeDure*, 962 F.3d at 911 (quoting *Holbrook*, 414 F.3d at 742). "[A] FELA plaintiff *injured by a defective condition* cannot recover damages without showing that the employer had actual or constructive notice *of the condition*." *Williams*, 161 F.3d at 1063 (emphasis added). That is, Martin needs to show that Union Pacific was on notice that the storage racks were defective or unsafe. *See id.* at 1062 (noting that under the FELA "an employer is not liable if it has no reasonable way of knowing that a potential hazard exists").

---

[2] As an aside, Plaintiff's claim about a design defect is at a high level of generality. He doesn't offer any details whatsoever about the feasibility of any redesign. He does not offer any details about what the redesigned racks would look like, or how they would work. The idea about the nets seems especially problematic. It's hard to see how passengers on the first level could put belongings on the racks if there were nets between the passengers and the storage racks. But most importantly, Plaintiff does not offer any *evidence* about the feasibility of adding nets or redesigning the racks some other way. Suggestions without evidence won't cut it at summary judgment.

In *Williams*, the Seventh Circuit considered a railroad conductor's FELA claim based on an injury suffered from "a sliding door on a moving train [that] slammed shut and struck him in the head." *See Williams*, 161 F.3d at 1060. When the conductor bent down to pick up a bag, the sliding door connecting the train cars suddenly closed, "striking him on the top of the head." *Id.* at 1061. The conductor alleged that the railroad was negligent under the statute by "failing to provide a reasonably safe workplace." *Id.* at 1060.

The Seventh Circuit affirmed summary judgment for the railroad. *Id.* at 1064. Under the FELA, "an employer is not liable if it has no reasonable way of knowing that a potential hazard exists." *Id.* at 1062. The railroad did not have actual knowledge of the allegedly defective door, and the employee did not provide evidence showing that the defect could have been discovered upon inspection. *Id.* at 1063.

Although the railroad's "duty to provide a safe workplace contemplates reasonable inspections of equipment and appliances," the employee had the burden to show that any defect could have been discovered with a reasonable inspection. *Id.* In other words, without evidence that the railroad had notice that the door was defective, the employee could not succeed on his FELA claim.

Martin's claim that the storage racks were defective looks a lot like the claim in *Williams* that the train door was defective. He alleges a defect in a component of the train, without any evidence that the railroad had notice of the defect. And without notice of the defect, any harm that Martin suffered from the falling Thermos was not foreseeable.

Martin argues that "[t]here is no question that it is reasonably foreseeable that items placed haphazardly and unsecured on a rack on the second level of a passenger train car could and would fall." *See* Resp. to Mtn. for Summ. J., at 38 (Dckt. No. 89). True, it is foreseeable

that items – including a Thermos – could fall or be dropped from the second level of the train. Gravity applies on trains, and things can fall.

But to establish foreseeability under the FELA based on unsafe or defective second-level storage racks, Martin must show that Union Pacific had notice of the defective condition. *See Williams*, 161 F.3d at 1063; *see also LeDure*, 962 F.3d at 911. And here, the condition is not the mere possibility that things could fall from above.

The foreseeability inquiry here is *not* whether it is foreseeable that an object could fall from the racks. *See CSX Transp.*, 564 U.S. at 703 (addressing whether it is foreseeable that a "particular condition" might result in injury). Everyone knows that things above can fall below. Instead, the foreseeability inquiry is about whether Union Pacific had reason to know that there was something wrong with the racks that could expose passengers below to an unreasonable risk of harm.

Martin's "things can fall" theory of liability is hard to square with the outcome in *Williams*. Again, in that case, the conductor stuck his head in the way of an open door on a moving train. In some sense, it is foreseeable that an open door can close when a train is chugging along. And in some sense, it is foreseeable that you can get whacked if you put flesh and bones in harm's way of an open door on a moving train. But that's not what foreseeability means in this context. Foreseeability requires notice that a *condition* is defective.

On this record, Martin has not presented any evidence showing that Union Pacific was on notice that the storage racks were defective at securing passenger belongings. *See Holbrook*, 414 F.3d at 745 (noting that summary judgment must be affirmed "where plaintiff introduced no evidence to show that an earlier inspection would have revealed or cured the defective condition, or that the railroad had notice of the defect prior to the accident") (cleaned up).

16

In fact, there is almost no evidence in the record about items falling from the storage racks. The only evidence is Martin's testimony that an item fell from the second level of the train – one other time – during his 13-year employment as a conductor. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 9 (Dckt. No. 82). But Martin did not report this episode to anyone at Union Pacific. *Id.* So, Union Pacific was not on notice of this incident.

What's more, that earlier incident didn't involve the storage racks at all. It involved a falling cup of coffee that "someone set . . . on the railing up above." *See* Martin Dep., at 55:13-24 (Dckt. No. 86-2, at 15 of 28). So, that earlier instance of a falling item didn't involve a defect in the second-level storage racks.

There is no evidence that the falling cup of coffee in that earlier incident injured anyone, either. In fact, the evidence shows that no one got hurt. *Id.* at 56:1-3 ("Q: Okay. And that was a near miss, but you didn't get impacted by the coffee? A: That's correct."). Without notice of an incident or an injury, it is hard to see how Union Pacific had notice that the storage racks were defective.

And in fact, there is no evidence that the incident with the Thermos involved a problem with the storage racks at all. "Plaintiff testified that he did not know where the Thermos fell from." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 82). The passenger believed that the Thermos must have fallen from his open bag. *Id.* at ¶ 8. But Plaintiff "does not know if the passenger had placed his bag on one of the storage racks." *Id.*

That testimony brings to an end any claim that the storage racks were defective. It is hard to blame the storage racks when no one knows if the storage racks played a role in the Thermos incident. No one knows if the Thermos was on the racks. And no one knows if the bag was on the racks. It is anyone's guess – and summary judgment is not a guessing game.

17

In sum, Martin has not offered evidence that Union Pacific was on notice of a defect in the second-level storage racks. So he cannot show that his injury from the Thermos was foreseeable.[3] And on this record, a reasonable jury could not find causation, because there is no evidentiary nexus between the storage racks and the injury.

Martin's second theory is that Union Pacific was negligent by not creating regulations for how passengers should store their personal belongings. As he sees it, Union Pacific should have made "an announcement asking passengers to secure their items, or check their items overhead, similar to announcements made on airliners about items moving about in the overhead bins during travel." *See* Resp. to Mtn. for Summ. J., at 37 (Dckt. No. 89).

Union Pacific argues that it is entitled to summary judgment because Martin hasn't presented any evidence that it was negligent. The Court agrees. A plaintiff in a FELA case has a "significantly lighter" burden, but even so, Martin has not carried it. *See Abernathy*, 940 F.3d at 988 (quotation marks omitted).

Martin hasn't presented any evidence showing that Union Pacific's negligence contributed to the falling Thermos. Again, consider the facts about how the Thermos fell. There aren't many. Martin testified that he couldn't tell how the Thermos fell. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 82). A passenger apologized to Martin and said that

---

[3] The Court takes it as a given that Martin suffered an injury to his shoulder caused by the falling Thermos. He is the non-movant, and he presented evidence of an injury, so the Court accepts it as true for purposes of this decision. Even so, the whole episode is curious. One has to wonder how heavy the Thermos was. If it contained only 16 ounces of liquid, that's a pound – plus the weight of the Thermos. Maybe the Thermos was a little bigger, but Thermoses are unlikely to be as heavy as a half-gallon of milk (which is four pounds). And the Thermos didn't exactly fall from the sky, either. The racks are accessible to passengers on the first level. They're, what, seven feet high? Maybe a little more? The distance between the storage racks (if that's where the Thermos was) and Martin's shoulder couldn't have been more than a few feet below. So, the claim involves a Thermos that weighed a few pounds and fell a few feet. Again, the Court accepts the evidence as true, including the fact that the Thermos injured Martin.

the Thermos must have fallen out of his open bag. *Id.* at ¶ 8. Martin doesn't know where the passenger's bag was located – that is, on the storage racks or somewhere else. *Id.*

After the incident, Martin spoke to a Union Pacific manager about the possibility of making an announcement asking passengers to secure their items. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 40 (Dckt. No. 92); Martin Dep., at 85:7-10, 86:8-24 (Dckt. No. 86-2, at 23 of 28).

Based on the undisputed facts, Martin doesn't explain how the falling Thermos "can be traced to [Union Pacific's] negligence." *Williams*, 161 F.3d at 1063. Martin hasn't presented evidence showing that items falling from the second level are generally a safety hazard. *See McGinn v. Burlington N. R.R. Co.*, 102 F.3d 295, 301 (7th Cir. 1996) (affirming summary judgment for the railroad where "the plaintiff failed to introduce any evidence which suggested . . . a safety hazard or which pointed to the necessity" of action by the railroad). The Seventh Circuit has "consistently . . . declined to infer negligence when a plaintiff fails to produce any evidence suggesting that the employer played even the slightest role in bringing about the injury." *Williams*, 161 F.3d at 1062 (collecting cases).

In *McGinn*, the plaintiff railroad employee tripped over a suitcase and argued that the railroad was negligent for failing to install luggage racks on its trains. *See McGinn*, 102 F.3d at 297, 301. But he "offered no evidence that luggage racks are standard train equipment or that the need for them has ever been discussed with [the railroad]." *Id.* at 301. And there was "no evidence that . . . the lack of a luggage rack would create a hazard." *Id.*

A plaintiff arguing for an additional warning also must present evidence about what it would be, and how it would make a difference. For example, in *Lee v. Air Canada*, 228 F. Supp. 3d 302, 313–14 (S.D.N.Y. 2017), a plaintiff argued that an airline should have warned

19

passengers not to go against the flow of traffic in an airplane aisle. A passenger went against the flow of traffic and dropped his luggage on the plaintiff's head when trying to put it in the overhead bin. *Id.* at 313. The court granted summary judgment to the airline. "[I]n cases where plaintiffs *have* survived summary judgment by pointing out ways to improve protocol, they relied upon testimony from experts or other types of factual evidence to show that the existing standards were inadequate or that potential improvements were possible or practicable." *Id.* at 314 (emphasis in original). But "no evidentiary support at all was presented to support Lee's proposed new warnings." *Id.*

Here, Martin has not presented any evidence that making announcements about securing passenger luggage was the standard way of running a railroad. He has not offered evidence that anyone ever discussed this issue with Union Pacific before his accident. The record is barren when it comes to evidence showing that passengers – and their luggage – on the second level of the train created a hazard to passengers and employees on the first level.[4]

Sometimes people drop things. And sometimes those things hit other people. But that's not enough, standing alone, to show negligence on the part of the *railroad*. The FELA "does not require the railroad to provide precautions that are impossible to defeat." *Reardon v. Peoria &*

---

[4] The Court offers two passing thoughts. First, this case doesn't involve a typical claim about a duty to warn. Martin isn't claiming that Union Pacific failed to warn *him* about something. Instead, Martin claims that Union Pacific should have told the passengers to be careful, and that the failure to give that warning caused a passenger to be careless, which led to the injury. So, the alleged injury is one step removed from a typical injury in a failure to warn case. Second, one wonders if the failure to give a warning can be a breach of duty if the warning is *obvious*. For example, imagine if the train had perfectly suitable stairs, and a passenger was klutzy or distracted, and took a spill down the steps. Does the railroad have a duty to tell passengers to be careful when walking down the stairs? Everyone knows that already. The warning is obvious. Is it a breach of duty for an employer to fail to tell a dog walker to look both ways before crossing the street? Or, is it a breach for a delivery company to fail to tell its drivers to drive carefully? One wonders if a defendant can breach a duty of care by failing to tell people what they already know. That is, one wonders if a defendant can breach a duty by failing to tell people to be careful and exercise reasonable care to protect themselves when nothing in the situation at hand poses an unusual risk. Is it a breach to fail to warn people about something that is obvious, or to fail to tell people something that they already know? (Something like: "Don't drop your stuff on the people below you.")

*Pekin Union Ry. Co.*, 26 F.3d 52, 55 (7th Cir. 1994). Martin hasn't presented evidence that Union Pacific was negligent in not issuing an announcement about how passengers stored their luggage.

And once again, the theory suffers from causation problems, too. No one knows how the Thermos fell. It is pure speculation to believe that making an announcement would have made a difference here, because the record is largely barren about how the accident happened.[5]

In sum, Union Pacific is entitled to summary judgment on Martin's FELA claim about the falling Thermos (Count I).

## B. The Injured Hand from the Fight with Watson (Count II)

Martin also brings a FELA claim for the injuries that he sustained during his fight with Watson. The Court concludes that Martin has offered enough evidence to get to trial.

Martin claims that Union Pacific failed to provide a reasonably safe working environment by failing to train him on "how to deal with an aggressive passenger" and "how to deal with [a] passenger that threatened violence." *See* Resp. to Mtn. for Summ. J., at 16 (Dckt. No. 89). That is, Martin believes that Union Pacific was negligent because it failed to train him on dealing with unruly passengers. And that lack of training led to his injury when he got in a fight with Watson.

---

[5] One wonders about other causation issues, too, above and beyond the fact that no one knows how the Thermos fell, or where it fell from. Martin's theory is that Union Pacific should have told people to secure their belongings. That announcement would have prevented the injury only if the passenger in question had (1) heard the announcement; (2) decided to comply; and (3) acted differently. But there is no evidence that an announcement would have changed the behavior of this particular passenger, or changed the behavior of passengers generally. Also, the passengers above largely share the incentives with the passengers below. Passengers on the second level don't want their belongings to fall, either (especially when a Thermos might contain coffee). The alignment of incentives makes one wonder if telling people to secure their belongings would have made a difference, because the second-level passengers were already incentivized to secure their belongings. Overall, on this thin record, it is pure speculation to believe that making such an announcement would have prevented this particular injury.

Union Pacific believes that it is entitled to summary judgment for three reasons. First, it contends that Martin was not acting within the scope of his employment when he was injured because company policy prohibits fighting with passengers and ejecting passengers before calling the police. *See* Mem. in Support of Summ. J., at 14–16 (Dckt. No. 79). Second, the company argues that Martin's injuries from the fight were not reasonably foreseeable. *Id.* at 16–20. And third, Union Pacific says that Martin hasn't shown evidence that it was negligent. *Id.* at 20–21.

Union Pacific first argues that Martin was not acting within the scope of employment when he suffered the injury. As the railroad sees it, Martin violated all kinds of company rules when he fought Watson. Rule 1.6 prohibits employees from being "[q]uarrelsome," and forewarns that "[a]ny act of hostility . . . is cause for dismissal." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 82). Rule 1.7 prohibits employees from "enter[ing] into altercations . . . with passengers and/or the general public." *Id.* at ¶ 14. And the railroad's passenger ejection policy states that "[p]assengers may only be removed from the train when they are placed in the custody of the police or another responsible authority." *Id.* at ¶ 12. But Martin decided to eject Watson without first calling the police, a violation of the policy.

The FELA requires a plaintiff "to prove that he was injured while in the scope of his employment." *Wilson*, 841 F.2d at 1351. The reason is simple. The statute imposes liability only when a railroad employee is "injured on the job." *Abernathy*, 940 F.3d at 988. So, to hold a railroad liable for a workplace injury, the injury must have occurred while the employee was performing tasks that were within the scope of employment.

To determine whether a FELA plaintiff was acting within the scope of employment, the Court looks to the factors in the Second Restatement of Agency. *See Wilson*, 841 F.2d at 1351

22

(citing Restatement (Second) of Agency § 229 (1957)); *Gilbert*, 2022 WL 1556101, at *4; *Perkins v. Illinois Ry., Inc.*, 2010 WL 963928, at *3 (N.D. Ill. 2010).

The Seventh Circuit has focused on two of these factors: (1) the employee's motivation; and (2) whether the employee's actions "furthered the railroad's business." *Wilson*, 841 F.2d at 1356. "Thus, conduct falls outside of the scope of employment 'only if it is done with no intention to perform it either as a part of, or incident to, a service for which the servant is employed.'" *Gilbert*, 2022 WL 1556101, at *4 (quoting *Ellerth v. Burlington Indus., Inc.*, 102 F.3d 848, 858 (7th Cir. 1996)).

An employee does not necessarily act outside the scope of employment simply because he violates a company policy. As the Seventh Circuit has explained, "[e]ven if [the employee's behavior] was not authorized, or required, it could still have been within the scope of his employment." *Wilson*, 841 F.2d at 1355.

In fact, the Second Restatement provides a list of factors to help "[i]n determining whether or not conduct, *although not authorized*, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment." *See* Restatement (Second) of Agency § 229 (1957) (emphasis added); *see also* Restatement (Second) of Agency § 230 (1958) ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment."); *id.* at cmt. b ("A master cannot direct a servant to accomplish a result and anticipate that he will always use the means which he directs or will refrain from acts which it is natural to expect that servants may do.").

Prohibited conduct is not automatically outside the scope of employment. *See, e.g.*, *Javier v. City of Milwaukee*, 670 F.3d 823, 830 (7th Cir. 2012) (discussing the "important" but "not intuitive" legal principle that "an employee can misuse or exceed his authority while still

23

acting with the scope of his employment").  "The fact that the servant's act is expressly

forbidden by the master, or is done in a manner which he has prohibited, is to be considered in

determining what the servant has been hired to do, but it is usually not conclusive, and does not

in itself prevent the act from being within the scope of employment."  *See* W. Page Keeton *et al.*,

Prosser and Keeton on the Law of Torts § 70, at 502 (5th ed. 1984).

Consider, by way of example, a car accident by a delivery driver.  A delivery company

might prohibit its drivers from getting into accidents, but that prohibition would not make the

accident outside the scope of employment.  It would not matter if the company prohibited

negligence – the driving would be within the scope of employment, even if the driver was going

a little too fast to deliver a package.

The use of force is no exception.  An employee who uses force against a customer might

be acting within the scope of his employment, too, even if the use of force is prohibited.  "It may

be said, in general, that the master is held liable for any intentional tort committed by the servant

where its purpose, however misguided, is wholly or in part to further the master's business."  *See*

Keeton *et al.*, *supra*, § 70, at 505.  The Second Restatement acknowledges that "[a]n act may be

within the scope of employment *although consciously criminal or tortious*."  *See* Restatement

(Second) of Agency § 231 (1958) (emphasis added).

"An employee's aggressive tactics to remove unwelcome guests might benefit the

employer."  *See Covarrubias v. Wendy's Props., LLC*, 2022 WL 1238666, at *10 (N.D. Ill.

2022).  "For example, a dramshop keeper may be liable under *respondeat superior* for a

bouncer's use of excessive force against a patron even if the keeper did not authorize the bouncer

to use such force."  *See Gaines v. Chicago Bd. of Educ.*, 2020 WL 1182767, at *5 (N.D. Ill.

2020).  An employee that physically removes a customer might do so for the benefit of his

24

employer. *See Covarrubias*, 2022 WL 1238666, at *9 ("Physically removing a loiterer from a Wendy's might be aggressive conduct, but that doesn't mean it was not for the benefit of Wendy's.").

In fact, one of the examples in Prosser & Keaton closely mirrors the facts here. The example considers a bus driver who commits an assault while ejecting a trespasser. The employer "will be held liable where his bus driver . . . assaults a trespasser to eject him from the bus." *See* Keeton *et al.*, *supra*, § 70, at 505.

The Seventh Circuit has applied this general rule in FELA cases. *See Ellerth*, 102 F.2d at 858 ("Criminal or tortious acts can be found to be within the scope of employment . . . ."). Specifically, the Court of Appeals cited approvingly a case that found an employee acted within the scope of employment after he "assaulted" another motorist "immediately after a collision between their respective vehicles." *Id.* Even though the employe had physically assaulted the plaintiff, "the inquiry is not whether the wrongful act itself was authorized but whether it was committed in the course of a series of acts of the agent which were authorized by the principal." *Id.* (quotation marks omitted). That is, throwing punches can be within the scope of employment even if the employer prohibits the behavior.

Here, a reasonable jury could conclude that Martin's fight with Watson was within the scope of his employment. Union Pacific acknowledges that Martin's "job duties . . . include[d] escorting passengers off the train." *See* Mem. in Support of Summ. J., at 15 (Dckt. No. 79). That job duty led to the fight, and Martin's injuries. In his role as a train conductor, Martin escorted Watson off the train. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 22–23 (Dckt. No. 82). As he performed that task, Watson shouted at Gilbert, and the two began fighting. *See*

25

Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 24–25 (Dckt. No. 92). At that point, Martin entered the fray.

Union Pacific says that Martin could not have been motivated to further its business when he struck Watson six times in the head. *See* Mem. in Support of Summ. J., at 15 (Dckt. No. 79). But Martin started punching Watson only after: (1) he told Watson to leave the train for being unruly; (2) Watson exited the train and approached Gilbert while shouting; and (3) Watson chest-bumped Gilbert, the two started fighting, and Gilbert fell to the ground. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 19–25 (Dckt. No. 82); Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 24–25 (Dckt. No. 92).

So, it wouldn't be much of a leap for a jury to conclude that Martin's motivation in punching Watson was to help Gilbert – his co-worker and a fellow Union Pacific employee – after their job-related escort went awry. A reasonable jury could conclude that fighting Watson was part of kicking Watson off the train. In other words, a jury could conclude that Martin's actions were "incident to" his job responsibilities as a train conductor. *See Gilbert*, 2022 WL 10556101, at *4.

Union Pacific points to a decision in this District, but it does not provide much help. In *Jackson*, a railroad was not vicariously liable under the FELA for a conductor's decision to punch a fellow employee because "it cannot be reasonably inferred from the record . . . that punching co-workers in the face falls within a conductor's job description." *Jackson v. BNSF Ry. Co.*, 2016 WL 6082359, at *4 (N.D. Ill. 2016). As Union Pacific sees things, *Jackson* holds that throwing punches isn't within the scope of a train conductor's employment.

But *Jackson* dealt with punches thrown for a different reason. Basically, two employees got in a fight. The plaintiff suffered injuries when a co-worker verbally assaulted him and

punched him in the face. *Id.* at *1. The assault was "undertaken . . . for a private purpose . . . having no causal relationship with his employment." *Id.* at *4 (quotation marks omitted). That is, he got in a private fight with a co-worker.

Martin, on the other hand, got in a fight with an unruly patron after escorting him off the train in his role as train conductor, right after he witnessed a co-worker getting assaulted. So, Martin entered a fight to *help* a co-worker while performing his job. He didn't pick a fight with a co-worker while on the job.

In its second argument, Union Pacific contends that Martin's injuries were not foreseeable because it lacked "actual or constructive knowledge of any frequent issues with unruly or disruptive passengers that were not successfully and safely resolved using the current measures in place." *See* Mem. in Support of Summ. J., at 17 (Dckt. No. 79). In other words, it argues that it did not have any reason to think that its policies for dealing with unruly passengers would not work.

Union Pacific's own policy shows an awareness that conductors might have to deal with unruly passengers. The policy sets guidelines for "when it becomes necessary to eject a passenger." *See* Passenger Ejection Policy (Dckt. No. 78-3). And the policy acknowledges that employees might need to "defuse the situation" or "[r]eason with the customer." *Id.* Situations involving ejecting a passenger might be "hostil[e]" and "tens[e]." *Id.*

Additionally, "the policy requires employees to fill out an 'Ejection/Confiscated Ticket Report' whenever a passenger is ejected, suggesting that the need to eject passengers occurs with sufficient regularity that Union Pacific has a dedicated form for documenting ejections." *Gilbert*, 2022 WL 1556101, at *5 (discussing Union Pacific's passenger ejection policy).

So, Union Pacific clearly contemplated that conductors might have to eject unruly passengers. And it contemplated that these situations could be hostile or tense. In fact, it anticipated that these situations could be so hostile that it required employees to eject passengers only "when they are placed in the custody of police or another responsible authority." *See* Passenger Ejection Policy (Dckt. No. 78-3). Belligerent passengers were clearly a foreseeable risk.

Union Pacific argues that it had no reason to believe that its policy would be ineffective in controlling passengers. That's neither here nor there. What matters for the foreseeability analysis is whether "the employer had actual or constructive notice of potential harm." *Abernathy*, 940 F.3d at 990 (quotation marks omitted). A reasonable jury could find that Union Pacific had that notice here. If anything, its policy on ejecting passengers detailed the potential harm.

True, when a FELA plaintiff claims that he was "injured by a *defective condition*," he "cannot recover damages without showing that the employer had actual or constructive notice of the condition." *Williams*, 161 F.3d at 1063 (emphasis added). But Martin doesn't argue that his hand was injured by some defective condition on the train (as he did for the falling Thermos in Count I). Instead, he argues that Union Pacific was negligent in failing to provide adequate training on dealing with unruly passengers. Unruly passengers – and the need to eject them from the train – posed a foreseeable harm.

In a similar vein, Union Pacific contends that Martin's injuries were not foreseeable because it lacked "actual or constructive knowledge of any previously disruptive behavior of Mr. Watson." *See* Mem. in Support of Summ. J., at 17 (Dckt. No. 79). So, because it didn't know

28

about Watson specifically, Martin's injury was not foreseeable, even if it knew about unruly passengers *generally*.

Foreseeability under the FELA does not require the railroad to foresee the exact circumstances that led to the plaintiff's injury. It simply requires "circumstances which a reasonable person would foresee as creating a potential for harm." *Holbrook*, 414 F.3d at 742 (quotation marks omitted).

"The railroad may be liable even if the *extent* of the injury or the *manner* in which it occurred was not probable or foreseeable." *Abernathy*, 940 F.3d at 990 (emphasis in original) (cleaned up); *see also Gilbert*, 2022 WL 1556101, at *5 ("It is . . . immaterial that Union Pacific did not foresee that Watson in particular posed a threat to crew members, as it foresaw that unruly and belligerent passengers in general could pose such a threat."). So, even if Union Pacific couldn't have foreseen Watson in particular, it's enough that it foresaw unruly passengers in general.

In its third argument, Union Pacific contends that Martin has failed to offer evidence of negligence. In its view, Martin has "fail[ed] to suggest any violation by Union Pacific of its duty to provide its employees with a reasonably safe workplace." *See* Mem. in Support of Summ. J., at 20 (Dckt. No. 79). The company also contends that Martin's negligence in deciding to fight Watson was the sole cause of his injuries. *Id.* at 20–21.

The basis for Martin's negligence claim is that he did not receive training on Union Pacific's policy on ejecting passengers. Martin testified that he never received any formal training on the railroad's policies for refusing to admit passengers and ejecting passengers. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 3 (Dckt. No. 92). He also testified that

he never received any formal training on how to deal with an aggressive or intoxicated passenger. *Id.* at ¶¶ 4, 6.

Union Pacific points to testimony from McGovern stating that Martin had a lengthy history of training on a range of topics. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 45 (Dckt. No. 82). Reed also testified that train crews are instructed to call the police before a situation escalates. *Id.* at ¶ 41.

Union Pacific might have evidence in its favor. Maybe the evidence is more voluminous, or more convincing. But summary judgment is not about weighing the evidence. A claim under FELA survives "if employer negligence played any part, even the slightest, in producing the injury." *Ruark*, 916 F.3d at 625 (quotation marks omitted).

Applying that standard, Judge Feinerman denied Union Pacific's motion for summary judgment on Gilbert's FELA claim based on his injuries from the October 27th brawl. Like Martin, "Gilbert testified that, prior to his injury, he did not receive formal training on implementing the 'Ejection of Passenger' policy or on handling belligerent and/or intoxicated passengers." *Gilbert*, 2022 WL 1556101, at *6. Judge Feinerman held that "[a] reasonable jury could find that Union Pacific failed to exercise reasonable care by promulgating the 'Ejection of Passenger' policy without training its employees on how to implement it." *Id.*

So too here. Martin offered evidence that the company failed to provide him with adequate training before confronting an unruly passenger. That testimony is enough to allow the claim to go forward.

## II.    FRSA Claim (Count III)

The final claim is a retaliation claim under the Federal Railroad Safety Act.  Martin has not come forward with enough evidence that he lost his job because he reported an injured hand.

The FRSA prohibits a railroad from firing an employee because he reported a work-related injury in good faith.  *See Holloway v. Soo Line R.R. Co.*, 916 F.3d 641, 644 (7th Cir. 2019).  The statute provides that a "railroad carrier . . . may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done . . . to notify . . . the railroad carrier . . . of a work-related personal injury."  *See* 49 U.S.C. § 20109(a)(4).

"To make a prima facie showing of unlawful retaliation in [the FRSA] context, an employee must show that:  (1) he made an injury complaint in good faith (i.e., engaged in a protected activity); (2) the rail carrier knew of the complaint; (3) he suffered an adverse employment action; and (4) the complaint was a contributing factor in the adverse action." *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 381 (7th Cir. 2018).  "Once that showing is made, the rail carrier can still escape liability if it can show, by clear and convincing evidence, that it would have taken the same action absent the protected activity."  *Id.*

"An FRSA retaliation claim cannot survive . . . absent a showing that [the employee's] superiors knew he had engaged in protected activity before taking any adverse action."  *Cyrus v. Union Pac. R.R. Co.*, 2015 WL 5675073, at *10 (N.D. Ill. 2015) (Lee, J.).

Under the FRSA, "the 'contributing factor' standard is lower than those applied in other anti-discrimination contexts."  *Armstrong*, 880 F.3d at 382.  It does not require the employee "to provide any proof of an employer's retaliatory motive."  *Id.*

31

However, when proving that the injury-related complaint was a "contributing factor" in the adverse action, the plaintiff must point to something more than suspicious timing alone. The "caselaw is clear that a plaintiff alleging retaliation in violation of § 20109(a)(4) *cannot point only to the sequence of events* – an injury report followed by a later dismissal – to show that the complaint was a contributing factor in the adverse employment action." *Holloway*, 916 F.3d at 644 (emphasis added). "Something more than the mere sequence of events is required" to satisfy the contributing factor element of the prima facie case. *Id.*

Martin alleges that Union Pacific fired him in retaliation for reporting his injured hand after the fight with Watson. He says that Union Pacific employees – including Reed, Lockhart, and Gibson – knew that he was injured. *See* Resp. to Mtn. for Summ. J., at 26 (Dckt. No. 89).

Union Pacific contends that Martin has not established three of the four elements of a prima facie case. First, the company argues that Martin never reported his hand injury in good faith. *See* Mem. in Support of Summ. J., at 21–22 (Dckt. No. 79). Second, Union Pacific contends that it didn't know that he complained about his injury. *Id.* at 23–25. Third, Union Pacific argues that Martin has not shown that his injury report (if it existed) was a contributing factor in his termination. *Id.* at 25–29.

So Union Pacific argues that there is no evidence to support elements one, two, and four. The third element – the existence of an adverse employment action – is not disputed.

Martin has presented sufficient evidence to satisfy elements one and two of a prima facie case. The record includes evidence that Martin complained about his hand injury in good faith, and that Union Pacific knew of his complaint. In fact, at least three Union Pacific employees – the Superintendent of Commuter Operations and two managers – knew that Martin was seeking medical treatment.

32

Reed testified that Martin "informed [him] that his hand was swollen" because of the altercation with Watson. *See* Reed Dep., at 39:22 – 40:11 (Dckt. No. 86-6, at 10 of 31); *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 55 (Dckt. No. 82); Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 26 (Dckt. No. 92). Reed also testified that he "made sure that there was a manager there that was taking Mr. Martin to urgent care to get his hand checked out." *See* Reed Dep., at 40:9-11. Reed is an important player in the story, too, because he signed Martin's termination notice.

Two Union Pacific managers – Lockhart and Gibson – then took Martin to urgent care for treatment. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 82). After receiving treatment, Martin told Union Pacific that he could not write because of his hand injury. *Id.* at ¶ 37. So, everyone agreed that Martin would give any statements the following week. *Id.*

That evidence is enough to support the first two elements of a claim. Martin has presented evidence that he made a complaint for a work-related hand injury, and that three managers knew about his injury. Martin has made a showing that his "superiors knew he had engaged in protected activity." *Cyrus*, 2015 WL 5675073, at *10.

Once again, Union Pacific points to other evidence in the summary judgment record. For example, Reed and Lockhart both testified that they did not know that Martin was injured. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 35, 48 (Dckt. No. 82). Also, Martin never reported his injury in a written injury form, and never mentioned any injury during a call to Union Pacific's commuter control center. *See* Mem. in Support of Summ. J., at 22 (Dckt. No. 79).

Maybe so. But the existence of countervailing evidence is not a reason to grant summary judgment. Again, summary judgment is not about weighing the evidence. The issue is not whether Union Pacific has a more persuasive story to tell. The issue is whether Martin presented

evidence that he complained about an injury, and that "the rail carrier knew of the complaint." *See Armstrong*, 880 F.3d at 381. And here, he did.

The third element of a claim, an adverse employment action, is not at issue here. Union Pacific does not deny that Martin satisfies that element. After all, he was fired.

Only the fourth element remains. But the fourth step is the stumbling block. Martin must present evidence that his injury-related complaint was a contributing factor in his firing. And on this record, the evidence is not there.

To establish that his injury-related complaint was a contributing factor in his firing, Martin needs to point to something more than timing. To satisfy his burden, it is not enough to "point only to the sequence of events – an injury report followed by a later dismissal." *Holloway*, 916 F.3d at 644.

But at the end of the day, Martin does not offer any evidence that his injury-related complaint – and not the fight itself – led to his termination. He offers nothing except suspicious timing.

Martin argues that his case is indistinguishable from *Gilbert*, where Judge Feinerman denied Union Pacific's summary judgment motion on a FRSA claim. *See Gilbert*, 2022 WL 1556101, at *7. But unlike Martin, Gilbert presented circumstantial evidence that his complaint about his work-related injury was a factor in his firing.

For starters, Gilbert presented evidence that "both Reed and McGovern's behavior changed markedly after he reported his injury and requested a medical leave." *Id.* The two went "from assuring [Gilbert] that he had done nothing wrong and had nothing to worry about to determining that his role in the incident warranted termination." *Id.*

34

Reed told Gilbert "that he had done nothing wrong by defending himself." *Id.* at *2. And "McGovern told Gilbert that he had done nothing wrong and had nothing to worry about, as he was merely defending himself." *Id.* at *1. Only later, after Gilbert submitted a formal request for medical leave, did their attitude toward him and the incident change. *Id.* at *2.

They flip-flopped. Evidence that "the employer's attitude toward the complainant changed after he or she engages in protected activity" can indicate that the protected activity was a contributing factor in the adverse employment action. *Cyrus*, 2015 WL 5675073, at *11. A change in attitude is circumstantial evidence that the injury-related complaint, not some other factor, led to the employment decision.

Martin had a different experience. Unlike Gilbert, Martin never heard anyone tell him that he did nothing wrong. He heard nothing. There is a big difference between hearing something, and hearing nothing.

Gilbert heard positive signals. Reed and McGovern gave assurances to Gilbert that he had done nothing wrong. Martin received no such assurances. Unlike Gilbert, Martin acknowledges that he never spoke with McGovern (again, Union Pacific's Director of Road Operations) about the incident. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 25 (Dckt. No. 92).

Gilbert and Martin are not similarly situated. Gilbert had more evidence. Reed and McGovern told Gilbert that he did nothing wrong. And then, they fired him. But Martin has not presented evidence that anyone at Union Pacific changed their tune after learning that he was injured.

The record does not include any other evidence that might support a claim. Martin hasn't pointed to evidence "showing that anyone within the company faulted or was frustrated with him

for reporting the . . . accident." *Holloway*, 916 F.3d at 644. Instead, he acknowledges that Lockhart and Gibson took him to urgent care without making any retaliatory statements. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 82).

Martin also did not "identify any evidence suggesting animus toward him – for example, that his supervisor had been looking for a reason to fire him and used his report of the accident as the reason to let him go." *Holloway*, 916 F.3d at 644; *see also Cyrus*, 2015 WL 5675073, at *11 (listing types of circumstantial evidence, including "indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, [and] the falsity of an employer's explanation for the adverse action taken").

In the end, Martin points to the timing of reporting his injury, and his firing. It is true that the injury and the firing took place close in time. But proximity in time, without more, is not enough to get to trial. Martin has not come forward with enough evidence that his injury-related complaint was a contributing factor in his termination.

Union Pacific is entitled to summary judgment on Martin's FRSA claim.

## Conclusion

For the foregoing reasons, Union Pacific's motion for summary judgment is granted in part and denied in part. The motion is granted for the FELA claim about the Thermos (Count I), and for the FRSA claim about reporting the hand injury (Count III). The motion is denied for the FELA claim about the injured hand from the fight with the unruly passenger (Count II).

Date: March 23, 2023

_____

Steven C. Seeger
United States District Judge